UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DAVID JOHNSON, CONNIE JOHNSON, and AARON JOHNSON, | Case No. 1:13-cv-00492-EJL-CWD |
| Plaintiffs, | **REPORT AND RECOMMENDATION** |
| v. | |
| CITY OF CALDWELL, CALDWELL POLICE DEPARTMENT, CHIEF OF POLICE CHRIS ALLGOOD, OFFICER C. HESSMAN, OFFICER J. DAVIS, and OFFICER J. BRIDGES, | |
| Defendants. | |

This is an action under 42 U.S.C. § 1983 and Idaho law, arising out of a

warrantless raid on the apartment of Plaintiffs David, Aaron, and Connie Johnson by

officers of the Caldwell Police Department (CPD) and the Canyon County Sheriff's

Office. Based on information relayed by the Nampa Police Department (NPD), the CPD

officers believed they were raiding the apartment of Bill Gerst to render emergency aid to

an unidentified female. Guns drawn and with attack dog at the ready, the officers broke

through the Johnsons' door unannounced, ordered the family out of their apartment,

handcuffed David and Aaron, and swept through the apartment only to realize Gerst

actually resided in the apartment next door. The officers proceeded to break into Gerst's apartment but found neither the unidentified female nor any sign of an emergency.

Alleging violations of the Fourth Amendment to the Constitution of the United States and various claims under Idaho law, the Johnsons filed suit against three of the CPD officers involved in the raid—Josh Bridges, James Davis, and Chad Hessman—as well as the CPD; CPD Chief Chris Allgood; and the City of Caldwell (the "Caldwell Defendants"). Now before the Court is the Caldwell Defendants' motion for summary judgment. (Dkt. 29.) The Caldwell Defendants argue that Bridges, Davis, and Hessman did not violate the Fourth Amendment and have qualified immunity even if they did. In addition, the Caldwell Defendants contend the Johnsons' state law claims, as well as all claims against the CPD, Chief Allgood, and the City of Caldwell, fail as a matter of law.

Pursuant to 28 U.S.C. § 636(b)(1)(B), District Judge Edward J. Lodge has referred all matters in this case to the undersigned. (Dkt. 36.) After considering the parties' briefing and the record, the Court will recommend the Caldwell Defendants' motion for summary judgment be granted in part and denied in part.

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure directs the court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Importantly, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). "A dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 514 (9th Cir. 2010) (quoting *Anderson*, 477 U.S. at 248).

"The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Secs. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Id.* "Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." *Id.* "If a party . . . fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for the purposes of the motion." Fed. R. Civ. P. 56(e)(2).

Factual disputes that would not affect the outcome of the suit are irrelevant to the resolution of a motion for summary judgment. *Anderson*, 477 U.S. at 248. As to the specific facts offered by the non-moving party, the Court does not weigh conflicting evidence but draws all inferences in the light most favorable to the non-moving party. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F. 2d 626, 630 (9th Cir. 1987). But, when confronted with a purely legal question, the court does not defer to the nonmoving party.

# BACKGROUND

## 1.      Facts[1]

The sequence of events that led CPD Officers Bridges, Davis, and Hessman to the Johnsons' door began with the NPD's investigation of threats posted on a Facebook[2] page registered to "Wild Mill Bill." In a series of Facebook posts[3], Wild Mill Bill directed threats at Hilda Valle, including the following:

> if you know @hilda Valle Then Im Fuckin Smashn on yo Girl she took 25 bucks from me watch me BEAT A FEMALE 4 my MONEY!!!

> I'm gonna rape this bitch n kill her kid over 25 bucks I swear I'm a fuckin sick nigga

> I'll pay any girl ..20 bucks to fight HildaValle

(Davis Aff. Ex. B, Dkt. 29-3 at 1–2.) On the night in question, the Facebook page also featured a picture of a bloody, naked female lying face down on a bed. Elsewhere on Wild Mill Bill's Facebook page were pictures of a black male holding firearms, as well as pictures of marijuana. The record does not disclose when any of these pictures were taken

---

[1]      The following facts are undisputed unless otherwise indicated. When the facts are disputed, they are taken in the light most favorable to the Johnsons, the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (recognizing the district court's obligation to construe the record in the light most favorable to the nonmoving party on motion for summary judgment).

[2]      Facebook is a social networking website that allows registered users to create a profile (referred to herein as a "Facebook page"), "add other users as 'friends,' exchange messages, post status updates and photos, share videos and receive notifications when others update their profiles." *Facebook*, Wikipedia.org, http://en.wikipedia.org/wiki/Facebook (last visited Apr. 8, 2015).

[3]      The record contains copies of Wild Mill Bill's Facebook page with a date stamp of "2/21/2013" (Davis Aff. Ex. B, Dkt. 29-3), but the text indicating the timing of each post to the page is not legible.

or posted, but it is undisputed that the threats and pictures were visible on Wild Mill Bill's Facebook page on the night of February 21, 2013.

That night, the NPD received a report[4] about the threats and the picture of the bloody female on Wild Mill Bill's Facebook page. According to an incident report prepared by NPD Officer Becky Doney, at approximately 11:04 p.m., Doney and other NPD officers were dispatched to check on Valle at a residence in Nampa, Idaho. (Doney Rpt., Dkt. 22-3 at 5–6.) The NPD officers found Valle at the residence and interviewed her. Valle identified Wild Mill Bill as Bill Gerst, and stated she had recently met Gerst through Facebook. Valle also stated that she and a friend had been at Gerst's apartment at approximately 6:00 p.m. that evening but left after Gerst began threatening Valle about $25 she owed him. Valle told the NPD officers Gerst lived on the second floor of an apartment building on the corner of Kimball and Chicago in Caldwell, Idaho.

After interviewing Valle, Doney returned to NPD Dispatch and viewed Wild Mill Bill's (Gerst's) Facebook page. She observed the threatening comments and a picture of a naked, bloody female. According to her incident report, Doney contacted the CPD and "advised" them about the picture and threatening comments on the page. (*Id.* at 5.) The

---

[4]     Incident reports prepared by CPD Officers Bridges, Davis, and Hessman indicate that NPD received the information regarding Wild Mill Bill's Facebook page from Valle. However, NPD officer Doney's incident report establishes that Valle had no knowledge of the Facebook threats until Doney told her about them. Contrary to the CPD officers' accounts, it appears that a woman named Kristin Farris reported the Facebook posts to the NPD out of concern for Valle's safety. (Dkt. 20 at 5; Dkt. 22 at 11; Dkt. 24 at 4, 6.) This discrepancy is not material to the Court's decision.

CPD dispatch then notified CPD Officers Bridges, Davis, and Hessman that the NPD was requesting assistance.

The Johnsons dispute the reason Doney gave the CPD for requesting assistance. They claim Doney told the CPD about a suspected "homicide" in "radio traffic" on the night in question. (Pls' Objection to Defs' Stmt. of Facts, Dkt. 33-1 at 2.) The record contains no evidence of the purported radio traffic, however.[5] The only evidence concerning the NPD's reason for requesting CPD assistance appears in the CPD officers' affidavits, as described below, and Doney's incident report, which states the NPD investigated Gerst for "solicitation of battery." (Doney Rpt., Dkt. 22-3 at 5–6.)

According to CPD Officer Davis, NPD requested CPD "attempt to make contact with Wild Mill Bill at his apartment in Caldwell" due to suspicion that some form of violent crime was in progress. (Davis Aff. ¶ 6, Dkt. 29-1.) At approximately 11:23 p.m. on February 21, 2013, CPD Officer Bridges "received information from the Nampa Police Department about a possible kidnapping and torture" at Gerst's apartment. (Bridges Aff. ¶ 5, Dkt. 29-11.) CPD Officer Hessman also received notice around the same time, indicating that NPD was requesting CPD assistance "concerning a violent crime that may be occurring" at Gerst's apartment. (Hessman Aff. ¶ 5, Dkt. 29-5.) CPD

---

[5]      Even if there was evidence of this purported radio traffic, that evidence would not be material, since the NPD's characterization of the situation goes to the CPD officers' subjective motive for entering the Johnsons' apartment. The United States Supreme Court has held an officer's "subjective motivation is irrelevant" to a Fourth Amendment analysis— what matters is the objective reasonableness of the officer's conduct under the circumstances. *Brigham City v. Stuart*, 547 U.S. 398, 404–05 (2006).

Officer Davis received notice at approximately 11:26 p.m. that NPD was requesting assistance for a "possible violent crime" at Gerst's apartment. (Davis Aff. ¶ 5.)

Hessman spoke to Doney by telephone shortly thereafter. While there is no transcript of this conversation in the record, Hessman's sworn affidavit states that Doney told him the following:

> Hilda Valle . . . reported a "Wild Mill Bill" had posted on his Facebook page a photograph of a naked female, covered in blood, lying on a bed. In the photograph, it appeared that the female had several lacerations on her body. NPD Doney also told me that Valle stated Wild Mill Bill had posted on his Facebook page he was going to rape and kill the female. It was also reported that he had made threats against Valle, and he had posted on Facebook he would pay someone $20 to beat up Valle.

(Hessman Aff. ¶ 5.) Hessman also states that Doney told him Valle reported Gerst's apartment was located "on the left-hand side immediately at the top of the stairs" on the second floor of the building at 409 North Kimball Avenue in Caldwell. (*Id*. ¶ 6.) Similarly, Davis's affidavit states that Doney identified Gerst's apartment as "the first apartment on the left at the top of the stairs on the second floor" but that "Hilda Valle could not remember the apartment number." (Davis Aff. ¶ 7.)

CPD Officers Bridges, Davis, and Hessman met in a parking lot a few blocks away from the reported location of Gerst's apartment building. Shortly thereafter, the NPD sent the officers electronic copies of Wild Mill Bill's Facebook page, and Davis viewed the page in his patrol vehicle—including what Davis describes as "a photo of a naked female covered in blood who appeared deceased or nearly deceased." (*Id*. ¶ 5.) The officers viewed additional pictures on Wild Mill Bill's Facebook page, including what Bridges described as "photographs that depicted a male, who [the officers] later

determined to be Billy Gerst . . ., [and] Gerst with an assault rifle and a handgun, marijuana, and large sums of cash." (Bridges Aff. ¶ 5; *see also* Davis Aff. ¶ 10.)

While at the parking lot, the CPD officers also investigated Gerst's background. The officers confirmed that Wild Mill Bill was Bill Gerst by cross-referencing the license plate of a vehicle pictured in Wild Mill Bill's Facebook posts with the plate on a vehicle parked at 409 North Kimball Avenue on the night in question. (Davis Aff. Ex. C, Dkt. 29-4.) In addition, they cross-referenced a photo of Gerst available through the Idaho Public Safety and Security System with photographs on Wild Mill Bill's Facebook page, thereby confirming that Gerst was a black man. They also called for backup. However, the officers were unable to verify Gerst's apartment number.

The CPD officers—all of whom were trained on Fourth Amendment requirements for searches and seizures—next decided how to proceed. In his sworn affidavit, Davis summarizes the officers' thinking at the time:

> Based upon the information provided by NPD Doney and the Facebook photos and commentary, I believed that someone in Gerst's apartment may be in imminent danger and it was necessary to make immediate entry into the apartment to protect the individual. I did not believe that we had time to seek a search warrant because the female victim depicted in the photographs on the Facebook pages may not survive the time it took to obtain a warrant. The process to obtain a warrant in February 2013 involved contacting a prosecutor; meeting with the prosecutor at his/her office; preparing the necessary paperwork; calling the available magistrate judge; meeting with the magistrate judge either at his/her chambers or house; going through the hearing process; and returning to the location where the warrant was to be served. From my own personal experience of going through that process twenty to thirty times prior to February 21–22, 2013, if everything went perfectly, I could not have had the warrant in less than one and one-half hours. Given all of the information we had, I did not believe that the female victim could survive.

(Davis Aff. ¶ 8.)[6]

Further, the officers decided not to knock and announce before breaching the door to Gerst's apartment. Davis "was concerned that Gerst would further injure or kill the female victim . . . if he knew [the officers] were at the apartment." (*Id.* ¶ 9.) Before proceeding, Davis called the on-duty deputy prosecuting attorney, who concurred in the decision to proceed with a no-knock, warrantless entry of Gerst's apartment.

Upon arrival at 409 North Kimball Avenue, officers from both the CPD and the Canyon County Sheriff's Office set up a perimeter around the apartment building while CPD Officers Bridges, Davis, Hessman, and Canyon County sheriff's deputies Brian Crawford and Heather Lavealle (handling a police dog) entered the building. At approximately 12:43 a.m. on February 22, 2013, the officers ascended to the second floor and approached the first apartment on the left at the top of the stairs—apartment number five. Except for Lavealle, all law enforcement officers present drew and pointed their guns at the doorway. At approximately 12:44 a.m., Hessman and Bridges kicked in the door to apartment number five.

Inside, they encountered two Caucasian males and one Caucasian female—David, Aaron, and Connie Johnson. Officer Davis recorded audio during the incident, which

---

[6]     In his affidavit, Davis twice references "the female victim depicted in the photographs," suggesting he saw multiple photographs of a bloody female on Gerst's Facebook page. (Davis Aff. ¶¶ 8–9.) But, elsewhere in his affidavit, Davis references a single "photo of a naked female covered in blood." (*Id.* ¶ 5.) Neither Bridges nor Hessman mention multiple photographs, and only one such photograph is visible on the copy of the Facebook page filed in this case. (Davis Aff. Ex. B, Dkt. 29-3.) Accordingly, the evidence, viewed in the light most favorable to the Johnsons, is that the CPD officers saw one photograph on Gerst's Facebook page depicting a naked female covered in blood.

includes the sound of the officers kicking the door repeatedly, followed by male and female voices shouting "police department show your hands," and a female voice (apparently Lavealle's) shouting "come out with your hands up; this dog will bite you." (Davis Aff. Ex. E, Dkt. 29-7.) The recording indicates no sign of physical struggle or verbal resistance from the Johnsons as they exited their apartment one-by-one. At approximately 12:47 a.m., Davis handcuffed David and Aaron—but not Connie—and detained the family in the hallway outside their apartment.

After the Johnsons' exited their apartment, Hessman and Bridges entered and attempted to locate Gerst and the suspected female victim. The Johnsons characterize this entry as a "search," whereas the Caldwell Defendants characterize it as a "sweep" and deny Hessman or Bridges searched or seized any property. In any event, Hessman and Bridges were inside the Johnsons' apartment for approximately 20 seconds looking for Gerst and his suspected victim.

Meanwhile, officers outside the building radioed the officers inside that a male in the apartment next door was "moving furtively." (Davis Aff. ¶ 14.) Once Hessman and Bridges determined that Gerst was not present in the Johnsons' apartment, the officers concluded Gerst must be in the apartment next door—number six. Hessman breached the door to apartment six, and the officers found Gerst inside. Hessman and Lavealle searched Gerst's apartment but found no sign of the female pictured on the Facebook page. Searches of the apartment and Gerst's person did uncover some marijuana, a bong, and other paraphernalia.

At NPD's request, Gerst was transported to the CPD where he was later interviewed by Doney. According to Doney's incident report, the NPD investigated Gerst for "solicitation of battery" against Valle. (*Id*. at 5.) Ultimately, however, Gerst was not charged with a crime in connection with his threats against Valle or the searches of his person and apartment.

At approximately 12:51 a.m., after Gerst was taken away, the CPD officers removed the handcuffs from David and Aaron Johnson and permitted the family to return to their apartment. Davis then explained the situation to the Johnsons and the reason the door was breached. The only physical damage the Johnsons' apartment sustained was damage to the door, door jamb, and lock. The City of Caldwell has reimbursed the Johnsons and their landlord for this damage.

## 2.    Procedural History

The Johnsons filed suit in November of 2013, alleging eight causes of action under 42 U.S.C. § 1983 and Idaho law. Specifically, the Johnsons seek relief under § 1983 for four alleged violations of the Fourth Amendment to the Constitution of the United States: (1) illegal entry and search of their apartment by "the defendants", (2) illegal seizure of their persons by "the defendants", (3) excessive force by "the officers", and (4) failure of the "police" to knock and announce before entering the apartment. (Compl. ¶¶ 69–103, Dkt. 1.) In addition, the Johnsons allege four claims under Idaho law: (5) illegal search in violation of Article I, § 17 of the Idaho Constitution; (6) negligent supervision by the City of Caldwell, the CPD, and CPD Chief Allgood; (7) false imprisonment by the "officers";

and (8) trespass by "the defendants." (*Id.* ¶¶ 104–131.) The Johnsons seek compensatory damages, punitive damages, declaratory relief, and reasonable attorney fees.

The Johnsons brought identical claims against the Caldwell Defendants and the Nampa Defendants—two NPD officers, the chief of the NPD, the NPD, and the City of Nampa. In late July of 2014, the Nampa Defendants moved to dismiss the Johnsons' claims under Federal Rule of Civil Procedure 12(b)(6). In mid-August of 2014, the Johnsons moved to amend their complaint, arguing their proposed amended complaint cured any pleading deficiencies in the original complaint. Finding the Johnsons' proposed amended complaint did not cure the deficiencies identified by the Nampa Defendants, the Court dismissed all claims against the Nampa Defendants on February 4, 2015. (Dkt. 36, *adopting* 34.) One day later, the Johnsons and the Nampa Defendants filed a stipulation to dismiss all claims against the Nampa Defendants with prejudice, which the Court approved on February 10, 2015. (Dkt. 39.)

In mid-December of 2014, the Caldwell Defendants filed the instant motion for summary judgment on all of the Johnsons' claims. The motion is fully briefed, and the parties presented oral arguments to the undersigned on March 23, 2015.

## ANALYSIS

### 1.    State Law Claims

The Johnsons concede that most of their state law claims fail as a matter of law. First, the Johnsons concede that all claims against the CPD must be dismissed because the CPD is not an entity subject to suit distinct from the City of Caldwell. *See, e.g.,*

*Duarte v. City of Nampa*, 2007 WL 1381784, at *4 (D. Idaho Mar. 13, 2007) ("NPD is in fact a subdivision of the City of Nampa and thus not a proper defendant in this case.").

With regard to their claim under the Idaho Constitution, the Johnsons concede this Court has repeatedly refused to recognize a "direct cause of action for violations of the Idaho Constitution." *Campbell v. City of Boise*, 2008 WL 2745121, at *1 (D. Idaho July 11, 2008); *see also Hancock v. Idaho Falls School Dist. No. 91*, 2006 WL 1207629, at *3 (D. Idaho May 2, 2006) (finding no direct cause of action under the Idaho Constitution nor any Idaho statute creating a cause of action for violations of the Idaho Constitution); *Sommer v. Elmore County*, 903 F.Supp. 2d 1067, 1074 (D. Idaho 2012) (same); *Mott v. City of McCall*, 2007 WL 1430764, at *6 (D. Idaho May 14, 2007) (same); *Boren v. City of Nampa*, 2006 WL 2413840, at *10 (D. Idaho Aug. 18, 2006) (same). And the Johnsons cite no authority that would call these holdings into question. Therefore, the Johnsons' claim under the Idaho Constitution fails as a matter of law.

Additionally, the Caldwell Defendants argue, and the Johnsons concede, that all state law claims against Chief Allgood and Officers Bridges, Davis, and Hessman are barred because the Johnsons failed to file a bond pursuant to Idaho Code § 6-610. Filing of a bond is a "condition precedent" to "any civil action . . . against any law enforcement officer . . . when such action arises out of, or in the course of the performance of his duty. . . ." Idaho Code § 6-610(2). If the defendant objects to the lack of a bond, "the judge shall dismiss the case." *Id.* § 6-610(5) "Dismissal in this circumstance is mandatory." *Beehler v. Fremont County*, 182 P.3d 713, 716 (Idaho App. 2008) (citing *Monson v. Boyd*, 348 P.2d 93, 94 (1959)). Therefore, the defendant law enforcement officers—

Allgood, Bridges, Davis, and Hessmand—are entitled to judgment as a matter of law on all of the Johnsons' state law claims.[7]

Likewise, it is undisputed that none of the Caldwell Defendants are liable for false imprisonment by operation of Idaho Code § 6-904(3). That statute provides: "A governmental entity and its employees while acting within the course and scope of their employment and without malice or criminal intent shall not be liable for any claim which . . . [a]rises out of . . . false imprisonment . . . ." The Idaho Supreme Court has held "[t]he plain language of [§ 6-904] exempts governmental entities from liability for the torts it lists, whether or not there has been an allegation of malice or criminal intent." *Hoffer v. City of Boise*, 257 P.3d 1226, 1228 (Idaho 2011). In addition, the employees of a governmental entity are immune from the listed torts "if there is no allegation of malice and/or criminal intent." *Id*. at 1229.  There are no such allegations in the Johnsons' Complaint, nor is there evidence in the record to support such allegations. Accordingly, § 6-904 bars the Johnsons' false imprisonment claim.

This leaves the Johnsons with a negligent supervision claim against the City of Caldwell. The essence of the claim is that the City breached its duty to train CPD officers on Fourth Amendment principles, including the knock-and-announce rule and the prerequisites for warrantless searches and seizures. To survive summary judgment on a negligent supervision claim, the plaintiff must "present evidence to raise a genuine issue

---

[7]    With regard to the Johnsons' trespass claim, there is no allegation the City of Caldwell encouraged or incited the alleged trespass. *See Lee v. Boise Dev. Co.*, 122 P. 851 (Idaho 1912) ("Any person present at the commission of a trespass, encouraging or inciting [the] same, is liable as a principal."). Therefore, summary judgment is not only appropriate as to the individually named defendants, but also as to the City.

of material fact concerning whether those who had the duty to supervise should have reasonably anticipated that those subject to their supervision would commit [a compensable tort].” *Kessler v. Barowsky*, 931 P.2d 641, 648 (Idaho 1997). The Caldwell Defendants argue the negligent supervision claim fails for two reasons: (1) no compensable tort occurred; and (2) Officers Bridges, Davis, and Hessman were trained on the Fourth Amendment.

Regardless of whether a compensable tort occured, it is undisputed that the City of Caldwell provided all three officers extensive law enforcement training, including training on searches and seizures under the Fourth Amendment and when it is necessary to knock and announce. (Bridges Aff. ¶ 4, Dkt. 29-11; Davis Aff. ¶ 4, Dkt. 29-1; Hessman Aff. ¶ 4, Dkt. 29-5.) The Johnsons have presented no evidence to contradict or otherwise call into question the officers’ training records. At most, the record viewed in the light most favorable to the Johnsons establishes that the officers did not follow their training on the night in question.

Even so, the Court finds no genuine issue of material fact as to whether the City of Caldwell could reasonably have foreseen the officers’ alleged unconstitutional conduct. While a City might reasonably anticipate constitutional violations by untrained or unruly officers, the undisputed facts do not support such a finding here. Bridges, Davis, and Hessman were trained in the relevant law. And there is no evidence to suggest the City knew or reasonably should have known these officers had some propensity to ignore their training or otherwise violate the Fourth Amendment. Moreover, the Johnsons do not argue the City of Caldwell could reasonably have taken additional steps to prevent the

officers' alleged unconstitutional acts. No reasonable jury could find the City of Caldwell liable for negligent supervision on this record.

2. **Section 1983 Claims Against the CPD, City of Caldwell, and Chief Allgood**

The barebones allegations in the Johnsons' Complaint could be read as § 1983 claims against the CPD, the City of Caldwell, and CPD Chief Allgood. So construed, however, the claims fail as a matter of law.

As the Johnsons' counsel conceded at oral argument, the CPD is not subject to suit under § 1983, because it is merely a division of the municipal government. *See Duarte v. City of Nampa*, 2007 WL 1381784, at *3 (D. Idaho Mar. 13, 2007) ("[T]he overwhelming majority of federal common law has found that police departments are not separate entities with the ability to be sued.").

To state a § 1983 claim against a municipality—including local government officials sued in their official capacities—a plaintiff must show the alleged injury was inflicted through execution or implementation of the municipality's "official policy." *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978). Specifically, the "plaintiff must prove (1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). "Official policy" may include a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity." *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 984 (9th Cir.2002). But "[p]roof

of a single incident of unconstitutional activity is not sufficient to impose liability, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policy maker." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823–34 (1985).

Even if a constitutional violation occurred, the Johnsons have presented no evidence that a policy or custom was the moving force behind the violation. In fact, the Johnsons admit "[p]erhaps there was no written policy to conduct late-night raids on innocent people." (Dkt. 33 at 12.) Nevertheless, they urge the Court to infer that "everyone involved believed their supervisors would approve of their actions. . . ." (*Id.*) This inference is not sufficient to support a *Monell* claim, because—regardless of what the officers may have believed—there is no evidence that the City of Caldwell had a policy or custom that authorized or approved the officers' actions on the night in question. Thus, the Johnsons' *Monell* claims, if any, are subject to summary dismissal.

Likewise, summary judgment is appropriate on any individual capacity claims asserted against Chief Allgood. "A supervisor is only liable for constitutional violations of his subordinates if the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them. There is no respondeat superior liability under section 1983." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). It is undisputed that Chief Allgood learned about the incident at the Johnsons' apartment only after it happened. (Allgood Aff. ¶ 6, Dkt. 29-15.) Thus, there is no evidence that Allgood directed, participated in, or had knowledge of any alleged misconduct by Officers Bridges, Davis, or Hessman.

**3.      Section 1983 Claims Against Officers Bridges, Davis, and Hessman**

What remains are the Johnsons' § 1983 claims against the individual officers. To make out a prima facie case under § 1983, the plaintiff must establish "(1) a violation of rights protected by the Constitution or created by federal statute (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The only element in dispute is whether Bridges, Davis, or Hessman violated the Johnsons' Fourth Amendment rights.

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed . . . ." *United States v. U.S. Dist. Court*, 407 U.S. 297, 313 (1972). But, as is evident from its wording, "[t]he touchstone of the Fourth Amendment is reasonableness." *United States v. Knights*, 534 U.S. 112, 118 (2001).

The Johnsons claim the officers' entry and search of their apartment was unreasonable, not only because the officers lacked a warrant, but also because the officers failed to knock and announce their presence before kicking in the door. In addition, the Johnsons claim the officers unreasonably seized them and used excessive force to do so.

The Caldwell Defendants raise two general defenses. First, they claim there was no constitutional violation, because the officers had reason to believe an emergency justified an unannounced, warrantless entry of what they thought was Gerst's apartment. The Caldwell Defendants further claim the officers acted lawfully by using limited force

to detain the Johnsons while they searched for Gerst and his suspected victim. Second, they claim that, even if the officers' conduct was unconstitutional, Bridges, Davis, and Hessman have qualified immunity.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). An officer with qualified immunity is not liable even when his or her conduct resulted from "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (internal quotations omitted). There are two prongs to the qualified immunity analysis: (1) whether the officers' conduct, viewed in the light most favorable to the party asserting injury, violated a constitutional right and (2) whether the right was "clearly established" such that a reasonable officer would have known his conduct violated the right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). However, the Court need not address the prongs in a particular order. *Pearson*, 555 U.S. at 236.

With regard to the second prong, "a Defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the Defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2023 (2014). However, it is "not necessary that the alleged acts have been previously held unconstitutional, as long as the unlawfulness [of defendant's actions] was apparent in light of pre-existing law." *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 977 (9th Cir. 2005).

## A. *Warrantless Entry*

"Where the government 'physically occupie[s] private property for the purpose of obtaining information,' that is a 'search' within the meaning of the Fourth Amendment." *United States v. Perea–Rey*, 680 F.3d 1179, 1184 (9th Cir. 2012) (quoting *United States v. Jones*, 132 S. Ct. 945, 949 (2012)). Clearly, the CPD officers searched the Johnsons' apartment by forcibly entering in an attempt to find Gerst and his suspected victim. The issue is whether the search was reasonable under the circumstances known to the officers at the time of entry. *See Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

### (1) *Clearly Established Right*

The law has long recognized that warrantless searches of a residence are "presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). "Nevertheless, because the ultimate touchstone of the Fourth Amendment is 'reasonableness,' the warrant requirement is subject to certain exceptions." *Brigham City*, 547 U.S. at 403. The only exception at issue here is the emergency aid exception.

Police may "enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Id*. But this exception is "narrow and [its] boundaries are rigorously guarded to prevent any expansion that would unduly interfere with the sanctity of the home." *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009) (internal quotations omitted). Officers' subjective intentions for making a warrantless entry are irrelevant; the question is whether the facts available at the time of entry provided "an objectively reasonable basis for believing that a person within the house is in need of immediate aid." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009)

(internal quotations, citation, and alteration omitted). Accordingly, the police must

"demonstrate 'specific and articulable facts to justify the finding' of . . . emergency."

*Sandoval v. Los Vegas Metro. Police Dept.*, 756 F.3d 1154, 1161 (9th Cir. 2014) (quoting

*LaLonde v. County of Riverside*, 204 F.3d 947, 957 (9th Cir. 2000)), *cert. denied* 83

U.S.L.W. 3352 (2015). Thus, it was clearly established on February 22, 2013, "that the

Fourth Amendment permits an officer to enter a residence if the officer has a reasonable

basis for concluding that there is an imminent threat of violence." *Ryburn v. Huff*, 132 S.

Ct. 987, 991 (2012).

### (2)     *Violation of Constitutional Right*

The Caldwell Defendants contend it was objectively reasonable for the CPD

officers to believe an unidentified female faced an imminent threat of violence inside

what they thought was Gerst's apartment. The Court must assess this contention "from

the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

hindsight." *Id*. at 992. But, even from this perspective, the undisputed facts and

reasonable inferences drawn from such facts must be viewed in the light most favorable

to the Johnsons. *See Sandoval*, 756 F.3d at 1160. Thus, the Court must deny summary

judgment unless every reasonable factfinder would conclude the entry was justified under

the emergency aid exception.

At the time they breached the Johnsons' door, the CPD officers knew the

following undisputed facts:

- Gerst (using the alter ego Wild Mill Bill) had at some point in the past
  posted a picture of an unidentified, naked, and bloody female on his
  Facebook  page;

- The Facebook page also contained pictures of Gerst holding an assault rifle and a pistol, as well as pictures of marijuana;

- Gerst had at some point posted on Facebook that he would beat up Hilda Valle because she owed him $25;

- Gerst had at some point posted a threat to "rape this bitch" and "kill her kid over 25 bucks" (Davis Aff. Ex. B, Dkt. 29-3 at 2);

- NPD Officer Doney had interviewed Valle before the NPD called for CPD assistance;

- Valle told Doney, who then told the CPD, that Gerst lived in the first apartment on the left at the top of the stairs on the second floor of 409 North Kimball Avenue;

- Valle could not remember, and the CPD could not verify, the number of Gerst's apartment;

- The NPD requested that the CPD "make contact" with Gerst (Davis Aff. ¶ 6, Dkt. 29-1); and

- Gerst's vehicle was parked in front of 409 North Kimball on the night in question.

The initial question is whether the officers had an "objectively reasonable, good faith" basis for relying on the NPD's report concerning the precise location of Gerst's apartment. *Motley v. Parks*, 432 F.3d 1072, 1082 (9th Cir. 2005) (en banc), *overruled on other grounds by United States v. King*, 687 F.3d 1189 (9th Cir. 2012) (per curiam). The facts bearing on this question are undisputed: the NPD's information came from Valle and the CPD's independent investigation of Gerst provided no reason to question Valle's recall. Further, the Johnsons have presented no evidence that would suggest the officers were not acting in good faith. Under these circumstances, it was reasonable for the

officers to believe Gerst lived in the first apartment on the left at the top of the stairs on the second floor of 409 North Kimball Avenue.

The critical question is whether the officers had an objectively reasonable basis for believing there was an emergent situation inside Gerst's apartment. The Caldwell Defendants argue it was reasonable to believe the female pictured on Gerst's Facebook page was at Gerst's apartment and in imminent danger of injury or death. They contend the circumstances of this case are analogous to two cases where the United States Supreme Court applied the emergency aid exception.

In *Brigham City v. Stuart*, officers were responding to reports of a loud party at a residence at 3 o'clock in the morning. 547 U.S. 398, 401 (2006). Looking into the kitchen through a screen door, the officers observed a group of adults trying to restrain a juvenile, who broke free and struck one of the adults in the face. With the victim spitting blood into a nearby sink, the other adults began pressing the juvenile "up against a refrigerator with such force that the refrigerator began moving across the floor." *Id*. Acting without a warrant, the officers announced their presence and, when no one responded, entered the kitchen to break up the altercation. The Court found no Fourth Amendment violation, holding "the officers had an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning." *Id*. at 406.

Similarly, in *Michigan v. Fisher*, witnesses directed police to a house where a man was "going crazy." 558 U.S. 45 (2009). As the officers approached, they observed "considerable chaos," including a smashed vehicle; broken house windows; and blood on

the vehicle, inside the vehicle, and on a door to the house. *Id*. 45–46. Through a window, the officers could see a man—Jeremy Fisher—screaming and throwing things. At first, the officers knocked, but Fisher refused to answer. Then, noticing a cut on Fisher's hand, the officers asked if he needed medical attention, but Fisher shouted profanities at them and told them to get a search warrant. At that point, one officer entered the house but retreated outside when he saw Fisher pointing a gun at him.

The Supreme Court again found no Fourth Amendment violation. The Court explained that "[o]fficers do not need ironclad proof of 'a likely serious, life-threatening' injury to invoke the emergency aid exception." *Id.* at 49. The exception applied because "it was reasonable to believe that Fisher had hurt himself (albeit nonfatally) and needed treatment that in his rage he was unable to provide, or that Fisher was about to hurt, or had already hurt, someone else." *Id*. The Court reasoned that a constitutional rule requiring officers to wait for a warrant in such circumstances would serve neither law enforcement nor public safety.

Both cases are readily distinguishable from the instant case. In *Brigham City*, the officers entered the residence after they saw one of the adults bleeding from a blow to the face. The considerable chaos that greeted the officers in *Fisher* also stands in stark contrast to the quiet scene at 409 North Kimball Avenue early on February 22, 2013. Simply put, the officers in both Supreme Court cases saw specific, articulable evidence of a potential emergency immediately before entering the residences in question. Under those circumstances, it was objectively reasonable for the officers to believe that someone inside the residences needed emergency aid.

Here, the officers' only basis for suspecting an emergency inside Gerst's apartment came from Wild Mill Bill's Facebook page, which featured a disturbing picture and a series of threats against a specific person—Hilda Valle.[8] This might be an objectively reasonable basis for suspecting something sinister was afoot inside Gerst's apartment *if* there was some reason to believe that Valle was the woman in the picture or the CPD had other reliable indications that an unidentified female was at risk. But the facts at the officers' disposal prove otherwise.

Nothing in the record suggests that Valle was the woman in the photograph. In fact, both Davis and Hessman knew that Valle was the source of the information that led the CPD officers to the Johnsons' apartment.[9] Although it is not entirely clear whether the officers also knew that NPD Officer Doney had visited Valle less than 30 minutes before the NPD requested the CPD's assistance, nothing in the officers' affidavits or incident reports suggests they believed Valle faced imminent danger at Gerst's apartment. To the contrary, Hessman's affidavit states that the purported emergency arose from

---

[8]    One of the threats on Gerst's Facebook page—"I'm gonna rape this bitch n kill her kid over 25 bucks"—does not specifically mention Valle. (Dkt. 29-3 at 2.) But, Davis—who viewed the page—indicates that the officers knew the threat was directed at Valle: "According to CPD Hessman, NPD Doney told him that . . . 'Wild Mill Bill' had threatened to kill a female named Hilda Valle and her child." (Davis Aff. ¶ 5.) Further, Davis's understanding is consistent with the Facebook page viewed as a whole. The immediately preceding comment on Gerst's Facebook page—"if you know @hilda Valle Then Im Fuckin Smashn on yo Girl she took 25 bucks from me watch me BEAT A FEMALE 4 my MONEY!!!"—mentions both Valle and the $25 debt. (Dkt. 29-3 at 2.) It would be reasonable to infer that the rape threat was directed at Valle because it also mentions the $25 debt. Thus, to the extent the Caldwell Defendants argue the rape threat could be read as a threat against some unidentified female, that argument is inconsistent with both Davis's affidavit and the record viewed in the light most favorable to the Johnsons.

[9]    It is not clear whether Bridges knew this information, and, in that connection, it is notable that Bridges is the only officer who believed he was responding to a "possible kidnapping and torture." (Bridges Aff. ¶ 5, Dkt. 29-11.)

"danger to the unidentified female." (Hessman Aff. ¶ 7, Dkt. 29-5.) Additionally, the Caldwell Defendants' counsel conceded during oral argument that the officers knew the unidentified female was not Valle. Therefore, Gerst's threats against Valle are not the kind of "particularized or imminent threats of violence" that would justify application of the emergency aid exception. *Sandoval*, 756 F.3d at 1164.

The only other potential evidence of an emergency is the picture of an anonymous, mutilated female on Gerst's Facebook page. The picture is shocking, it depicts an act of horrific violence, and one might reasonably conclude the subject was in mortal danger. But it is wholly without context. Nothing, aside from its appearance on Wild Mill Bill's Facebook page, would suggest that the act depicted occurred within the United States— let alone inside Gerst's apartment. It is not even clear when the picture was posted to the Facebook page. The picture is simply untethered—as a matter of time and place—to the purported emergency occurring inside Gerst's apartment early on February 22, 2013. In an age when a few keystrokes can fetch gigabytes of disturbing imagery, it is a stretch at best to argue a picture on a website is, by itself, a sufficient factual predicate for a warrantless raid on a residence.

That is true even with "allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving." *Graham v. Connor*, 490 U.S. 386, 397 (1989). Here, Bridges, Davis, and Hessman took time to reflect. They breached the Johnsons' door approximately one hour and twenty minutes after receiving the NPD's call for assistance. This was enough time to gather backup, scrutinize Gerst's Facebook page, review Gerst's criminal record, link

Gerst's vehicle to 409 North Kimball, and deliberate over how to proceed. In other words, the officers determined there was an emergency requiring *immediate* police action more than an hour after receiving the call from the NPD.

By comparison, the officers in *Brigham City* and *Fisher* made snap judgments as arguable emergencies unfolded before their eyes. The *Brigham City* officers announced their presence and then entered the residence only after witnessing blood being drawn during a late-night imbroglio. In *Fisher*, the officers witnessed specific indicia of violence—blood, smashed windows, and a bleeding subject shouting profanity and throwing things inside a barricaded house—before announcing their presence and entering. Likewise, Ninth Circuit cases applying the emergency aid exception all involve officers confronted with either direct or very strong circumstantial evidence of an emergency. *See*, *e.g.*, *United States v. Bradley*, 321 F.3d 1212 (2003) (mother arrested for methamphetamine possession reported nine-year-old child was home alone in the middle of the night); *Martin v. City of Oceanside*, 360 F.3d 1078 (9th Cir. 2004) (father called police with urgent request to check on the safety of his daughter, officer knocked on daughter's door and police called daughter's phone number, but daughter did not answer); *United States v. Martinez*, 406 F.3d 1160 (9th Cir. 2005) (NPD officers responding to report of domestic violence encountered woman crying on front lawn of home and heard a man shouting from inside); *United States v. Russell*, 436 F.3d 1086 (9th Cir. 2006) (multiple confused 911 calls reported shooting inside a home and that shooter was still inside the house when the officers arrived).

Here, by contrast, the officers witnessed Gerst's Facebook page. By itself, the page presented no objectively reasonable basis to suspect someone was in imminent danger inside Gerst's apartment. "Simply invoking the unknown in these circumstances is not sufficient." *Sandoval*, 756 F.3d at 1164. And finding otherwise would "expand the narrow, rigorously guarded exception to the warrant requirement beyond all recognition." *Hopkins*, 573 F.3d at 765 (internal quotation and alterations omitted).

Viewing the facts available to the officers in the light most favorable to the Johnsons, a reasonable jury could conclude that the officers lacked an objectively reasonable belief that someone faced imminent danger inside Gerst's apartment. The clearly established law at the time of the raid required a reasonable belief of imminent danger—supported by specific, articulable facts—to invoke the emergency aid exception. Therefore, the officers are not entitled to qualified immunity on the Johnsons' unlawful entry claim.

**B.    *Unannounced Entry***

The Court  next considers whether it was reasonable for the officers to forcibly enter the Johnsons' apartment without first knocking and announcing their presence. Although factually and temporally related to the officers' decision to proceed without a warrant, the decision to enter a residence unannounced raises a distinct legal question. *See Brigham City*, 547 U.S. at 406; *Ingram v. City of Columbus*, 185 F.3d 579, 588 (6th Cir. 1999). After all, "the time officers must spend knocking and announcing is surely shorter than the time they must spend obtaining a warrant." *Ingram*, 185 F.3d at 588 n.6.

**(1)** *Clearly Established Right*

The rule that law enforcement officers must announce their presence before entering a private residence was a feature of English common law "woven quickly into the fabric of early American law." *Wilson v. Arkansas*, 514 U.S. 927, 934 (1995). This principle allows individuals "the opportunity to comply with the law and to avoid the destruction of property occasioned by a forcible entry." *Richards v. Wisconsin*, 520 U.S. 385, 393 n.5 (1997). It also may protect "human life and limb, because an unannounced entry may provoke violence in self-defense by the surprised resident." *Hudson v. Michigan*, 547 U.S. 586, 594 (2006). And it protects basic rights of privacy and dignity by "assur[ing] the opportunity to collect oneself before answering the door." *Id.*

But, because the Fourth Amendment's reasonableness standard is flexible, the knock-and-announce rule is not absolute. An unannounced forced entry may be justified when the police "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Richards*, 520 U.S. at 394. Although reasonable suspicion is not a high bar, "the police should be required to make it whenever the reasonableness of a no-knock entry is challenged." *Id.*

There are no categorical exceptions to the rule. *Id.* Rather, "the facts and circumstances of the particular entry [must] justif[y] dispensing with the knock-and-announce requirement." *Id.* Factors relevant to the reasonableness of a no-knock entry include the size of the residence, time of day, nature of the offense, and any other

observations by law enforcement that would support a forced entry. *United States v. Combs*, 394 F.3d 739, 744 (9th Cir. 2005). But "[a] physical knock, or any other one factor, is not dispositive." *Id.* Thus, on the night of the raid, the law clearly established that police needed a reasonable suspicion of some exigency to justify a no-knock entry.

### (2)    *Violation of Constitutional Right*

The Caldwell Defendants' position is that Gerst posed an "obvious threat" to the unidentified female in the Facebook picture and others at the scene. (Dkt. 31-2 at 9.) The officers based this conclusion on Gerst's Facebook page, which showed Gerst (at unknown times and in unknown contexts) in possession of firearms. The Caldwell Defendants also note that Gerst's Facebook page contained pictures of marijuana. But, as Davis explains in his affidavit, the officers' primary consideration was their concern that "Gerst would further injure or kill the female victim depicted in the photographs on his Facebook page if he knew we were at the apartment." (Davis Aff. ¶ 9, Dkt. 29-1.)

The Johnsons respond that the officers lacked a reasonable suspicion that knocking and announcing their presence would have been dangerous or futile, or would have inhibited the investigation of a crime. In fact, the Caldwell Defendants concede that they were "not investigating the commission of a crime or searching for evidence" when they kicked in the Johnsons' door. (*Id.* ¶ 11.) Nor have the Caldwell Defendants presented any evidence that knocking and announcing would be futile under the circumstances. Rather, their defense rests on the claim that Gerst was too dangerous to risk being alerted to the officers' presence.

This claim is double-edged. Forced entry into a residence carries an inherent risk of provoking a violent response from the surprised occupants. *Hudson*, 547 U.S. at 594; *see also Miller v. United States*, 357 U.S. 301, 313 n.12 (1958) (Knocking and announcing "is also a safeguard for the police themselves who might be mistaken for prowlers and be shot down by a fearful householder."). That risk was enhanced in this case, as the officers opted to conduct a midnight raid on a multi-unit apartment building based on an incomplete description of the target residence.[10] The Supreme Court has long cautioned against ignoring the "very real [possibility] that police may be misinformed as to the name or address of a suspect" lest "[i]nnocent citizens . . . suffer the shock, fright or embarrassment attendant upon an unannounced police intrusion." *Ker v. State of Cal.*, 374 U.S. 23, 57 (1963).

Moreover, the Caldwell Defendants' claim is not a reasonable characterization of the facts viewed in the light most favorable to the Johnsons. As discussed above, it was not objectively reasonable to believe anyone was in danger inside Gerst's apartment. Similarly, the Facebook pictures of Gerst holding firearms are completely devoid of contextual information that would reasonably suggest Gerst possessed firearms inside his apartment on the night in question—it is not even apparent when or where the pictures were taken.[11] While the officers reviewed Gerst's criminal background, their affidavits

---

[10]     Davis and Hessman knew that Valle could not recall Gerst's apartment number, but they either did not or could not confirm Gerst's apartment number during the pre-raid investigation. (Davis Aff. ¶ 6–7, Dkt. 29-1; Hessman Aff. ¶ 6, Dkt. 29-5.)

[11]     Both pictures of Gerst holding firearms depict Gerst standing outdoors. (Bridges Aff. Ex. J, Dkt. 29-13 at 1; Davis Aff., Ex. B, Dkt. 29-3 at 11.)

mention nothing that would suggest he had a history of violence. And, perhaps most tellingly, all was quiet and calm—not a scream, a sign of struggle, or a drop of blood—at 409 North Kimball before the officers began their unannounced raid. Given these circumstances, a vague threat of violence emanating from Wild Mill Bill's Facebook page does not justify a no-knock entry. Finding otherwise would subvert the privacy, property, and safety interests undergirding the knock-and-announce requirement.

That is not to say potential danger to officers or others is never a sufficient basis for a no-knock entry. Rather, it is simply a recognition of clearly established law, which requires a particularized showing of danger or some other exigency before the police can enter a residence unannounced. *See Thompson v. Mahre*, 110 F.3d 716, 722 (9th Cir. 1997) (noting exceptions to the rule such as "where the police officers reasonably believe themselves to be endangered because the defendant had previously expressed willingness to use firearms against police and was known to have them"). Given the particular circumstances of this case, a reasonable jury could find the officers lacked an objectively reasonable basis for disregarding the knock-and-announce rule. Because that rule and its potential exceptions were clearly established on the night of the raid, the Court will recommend the denial of qualified immunity on the Johnsons' knock-and-announce claim.

### C. *Conduct After the Entry—Detention and Use of Force*

The Johnsons also claim that the officers violated their rights by using excessive force to unlawfully detain them while the officers searched for Gerst and his suspected

victim.[12] The Fourth Amendment is implicated "whenever a police officer accosts an individual and restrains his freedom to walk away"—even when the seizure does not "eventuate a trip to the station house and prosecution for crime." *Terry v. Ohio*, 392 U.S. 1, 16 (1968). That is because a "seizure" of an individual takes place when "by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980).

Although the Johnsons were not formally arrested, the record compels the conclusion that they were nonetheless seized within the meaning of the Fourth Amendment. The officers burst through the Johnsons' door with guns drawn, ordered the family out of their home, handcuffed Aaron and David, and detained the family outside their home for approximately four minutes. The question is whether every reasonable officer would have known that this seizure, and the force used to effect it, was unreasonable under the circumstances.

### (1) *Clearly Established Right*

Persons inside a residence have the right to be free from seizure by police, unless the officers have lawful authority to enter the residence in the first instance. *Payton v. New York*, 445 U.S. 573, 589–90 (1980); *Michigan v. Summers*, 452 U.S. 692, 699

---

[12]     The Johnsons' excessive force claim is premised, in part, on the officers' use of a police dog during the raid on their apartment. (Compl. ¶¶ 86–94, Dkt. 1.) However, it is undisputed that Canyon County Sheriff's Deputy Lavealle (who is not a party to this lawsuit) handled the dog for the duration of the raid. Davis's audio recording of the raid confirms that Lavealle, the only female officer present, was the only person making threats with the dog. (Davis Aff. Ex. E, Dkt. 29-7.)  Therefore, Bridges, Davis, or Hessman cannot be liable for an alleged constitutional injury stemming from Deputy Lavealle's handling of the dog. *See Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) (requiring "personal participation in"—as opposed to merely being present for—"the alleged rights deprivation").

(1981). Outside a residence, *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny, provide police narrow authority to make temporary, investigatory detentions based on "reasonable suspicion"—that is, "a particularized and objective basis for suspecting the person stopped of criminal activity." *United States v. Crapser*, 472 F.3d 1141, 1147 (9th Cir. 2007) (internal quotations omitted). The logic behind the *Terry* rule is that "some seizures admittedly covered by the Fourth Amendment constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity." *Michigan v. Summers*, 452 U.S. 692, 699 (1981).

Extending this logic, the Supreme Court has held that officers have "categorical" authority to detain occupants of a residence while the police search the premises pursuant to a search warrant—even when the occupants pose no particular danger to the officers and are not suspected of wrongdoing. *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (citing *Summers*, 452 U.S. at 705). But this categorical authority depends entirely on the authority to conduct a *lawful* search of the premises. *See Summers*, 452 U.S. at 701 ("Of prime importance in assessing the intrusion is the fact that the police had obtained a warrant to search respondent's house for contraband.").

When officers have the lawful authority to seize an individual, they necessarily have the authority to use reasonable force. *Muehler*, 544 U.S. at 98–99; *see also Graham v. Connor*, 490 U.S. 386, 396, (1989) ("the right to make and arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat

thereof to effect it."). But the use of force must be reasonable under the circumstances, and the analysis must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396 (internal quotations omitted). This requires careful attention to the facts and circumstances of the case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*.

### (2)    *Violation of Constitutional Right*

The Caldwell Defendants claim the officers had categorical authority to forcibly detain the Johnsons, because "[h]andcuffing occupants of premises during a search is a reasonable use of force." (Dkt. 31-2 at 11 n.3, citing *Muehler*, 544 U.S. at 98–99.) *Muehler* does not support this broad proposition. The case involved an innocent, non-suspect, who was handcuffed inside her residence while the police executed a search warrant for weapons as part of the investigation of a gang-related drive-by shooting. The Supreme Court held the detention was lawful under *Summers* and the use of handcuffs was reasonable under the circumstances, explaining the "safety risk inherent in executing a search warrant for weapons was sufficient to justify the use of handcuffs." *Muehler*, 544 U.S. at 100.

Here, the officers had no warrant and—when the facts are viewed in the light most favorable to the Johnsons—they lacked a reasonable basis for proceeding without one. Unlike the officers in *Muehler*, the officers here were "not investigating the commission of a crime or searching for evidence." (Davis Aff. ¶ 11, Dkt. 29-1.) In these

circumstances, the *Summers* line of cases simply does not apply, and no reasonable officer would have believed otherwise. The categorical authority to make a *Summers* seizure is justified by the governmental interest in the orderly completion of a lawful search. *Muehler*, 544 U.S. at 98. In the absence of a lawful search, the officers lacked such categorical authority.

Nor did the officers have an independent basis for an investigatory detention based on reasonable suspicion. None of the Johnsons resembled Gerst,[13] and the Johnsons were not suspected of criminal activity. Nothing in the record would reasonably suggest otherwise. Because the officers' warrantless entry into the Johnsons' apartment was unlawful under the Fourth Amendment, their suspicionless detention of the family was also unlawful. *See Payton*, 445 U.S. at 589–90. Accordingly, the officers are not entitled to qualified immunity on the Johnsons' illegal seizure claim.

Further, the Johnsons were not armed and did not resist the officers in any way. Even if the officers had some justification for detaining the family, none of the factors that might support the use of force under *Graham* were present in this case. The officers nevertheless pointed guns at the Johnsons and handcuffed Aaron and David. Notwithstanding the limited force applied and the short duration of the detention, a reasonable jury could conclude the threatening use of guns and the handcuffing of

---

[13]     By itself, this fact is not dispositive. Just because the officers initially encountered the Johnsons, who are all Caucasian, it does not follow that the officers should have known they would not find Gerst, who is black, inside apartment number five. *See Los Angeles County v. Rettele*, 550 U.S. 609, 613 (2007). But the lack of a resemblance does undercut the reasonableness of forcibly detaining the Johnsons while the officers located Gerst.

unarmed and compliant non-suspects constitutes excessive force under clearly established law. *See Sandoval*, 756 F.3d at 1165–67.

## CONCLUSION

When viewed in the light most favorable to the Johnsons, the undisputed facts establish that CPD Officers Bridges, Davis, and Hessman, conducted an unannounced, midnight raid on the Johnsons' residence—based on threats and pictures posted to Gerst's Facebook page. While the threats referenced a specific individual, the officers had sufficient information to know the individual was not in imminent danger. And, although the pictures depicted a bloody, unidentified woman and Gerst holding firearms, the officers had no contextual information that would lead a reasonable officer to believe the woman faced actual or imminent danger inside Gerst's apartment. Even so, the officers' subjective understanding of these circumstances led them to gather a posse—but not a warrant—and kick down the door to what they thought was Gerst's apartment. Inside, the officers found only the Johnsons, who they forcibly detained without legally adequate cause. Clearly established Fourth Amendment law does not provide law enforcement immunity for such behavior.

However, the officers' conduct does not, in isolation, provide a basis for holding the City of Caldwell or Chief Allgood liable under § 1983. In addition, the Johnsons' claims under Idaho law fail as a matter of law. For the reasons discussed above, the Court will recommend that summary judgment be granted, except with respect to the Johnsons' § 1983 claims against Bridges, Davis, and Hessman.

# RECOMMENDATION

**NOW THEREFORE IT IS HEREBY RECOMMENDED** that the Caldwell

Defendants' Motion for Summary Judgment (Dkt. 29) be **GRANTED IN PART AND**

**DENIED IN PART**.

Written objections to this Report and Recommendation must be filed within

fourteen (14) days pursuant to 28 U.S.C. § 636(b)(1) and Dist. Idaho L. Rule 72.1(b), or

as a result of failing to do so, that party may waive the right to raise factual and/or legal

objections to the United States Court of Appeals for the Ninth Circuit.

Dated: April 08, 2015

Honorable Candy W. Dale
United States Magistrate Judge