UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

DAVID JOHNSON, CONNIE JOHNSON, and AARON JOHNSON,

Plaintiffs,

v.

CITY OF CALDWELL, CADWELL POLICE DEPARTMENT, CITY OF NAMPA, NAMPA POLICE DEPARTMENT, CHIEF OF POLICE CHRIS ALLGOOD, CHIEF OF POLICE CRAIG KINGSBURY, OFFICER C. HESSMAN, OFFICER J. DAVIS, OFFICER J. BRIDGES, OFFICER B. DONEY, SGT. LATHROP, AND DOES I – X,

Defendants.

Case No. 1:13-CV-00492-EJL-CWD

**ORDER ON REPORT AND RECOMMENDATION**

On April 8, 2015, United States Magistrate Judge Candy W. Dale issued a Report and Recommendation ("Report"), recommending that Defendants' Motion for Summary Judgment be granted in part and denied in part. (Dkt. 41.) Defendants filed objections to the Report (Dkt. 42-2), and Plaintiffs responded (Dkt. 46). The Court has considered the parties' contentions and finds as follows.

## STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court may accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate judge. Where the parties object to a report and recommendation, this Court shall make a *de novo* determination of those portions of the report to which objection is made. *Id*. Where, however, no objections are filed, the district court need not conduct a *de novo* review. To the extent that no objections are made, arguments to the contrary are waived. *Id*.; *see also* Fed.R.Civ.P. 72. "When no timely objection is filed, the Court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." Advisory Committee Notes to Fed. R. Civ. P. 72 (citing *Campbell v. United States Dist. Court*, 501 F.2d 196, 206 (9th Cir.1974)).

The Court has reviewed the entire Report and the record in this matter and finds no clear error on the face of the record. In this case, only Defendants filed objections to the Report. The Court has conducted a *de novo* review of the portions of the Report to which Defendants object and finds as follows.

## BACKGROUND

The background of this matter is well stated in the Report and is not objected to by the parties. As such, the Court adopts the Report's recitation of the general and procedural background of the case. (Dkt. 41, pp. 4-11.) In brief, in the early morning hours of February 22, 2013, Caldwell Police Officers James L. Davis, Chad Hessman, and Josh Bridges (collectively "CPD Officers") kicked in the door to the Johnsons' apartment without a warrant and without knocking and announcing their presence. With

their guns drawn, the CPD Officers proceeded to handcuff two of three members of the Johnson family, and detained the family in the hallway outside their apartment while Officers Hessman and Bridges conducted a sweep of the apartment. It is undisputed that the reason for the warrantless search was the CPD Officers' mistaken belief that the Johnsons' apartment belonged to another individual, William Gerst ("Gerst"). Gerst resided in the apartment adjacent to the Johnsons.

The sequence of events that led the CPD Officers to the Johnsons' door began with an investigation by the Nampa Police Department ("NPD") of threats posted on a Facebook page registered to Gerst.[1] In a series of posts on the evening of February 21, 2013, Gerst directed threats at a woman named Hilda Valle ("Valle"). Gerst's threats culminated with the posting of a picture of a naked, bloody female lying face down on a bed.[2] Elsewhere on the page were pictures of Gerst holding firearms, as well as pictures of marijuana.

---

[1] Gerst's page was registered to "Wild Mill Bill." It is undisputed that the Facebook page registered to "Wild Mill Bill" belonged Gerst.

[2] Although the timing of each of the aforementioned posts was not legible in the exhibit contained in the record before Judge Dale, counsel for Defendants provided a legible copy of Gerst's Facebook page in support of their objections to the Report. The pertinent timing of the entries made on Gerst's Facebook page on the evening of February 21, 2013 were:

| Entry | Time Event |
|---|---|
| (a) "If you know @hilda Valle Then Im Fuckn Smashn on yo Girl she took 25 bucks from me watch me BEAT A | about an hour ago |

(Continued)

After receiving reports about the threats and picture on Gerst's Facebook page on the night in question, NPD officers were dispatched to check on Valle at approximately 11:04 p.m.[3] The NPD officers found Valle at her residence in Nampa, Idaho, and interviewed her. Valle stated that she and her friend had been at Gerst's apartment earlier that evening but left after Gerst began threatening Valle about $25 she owed him. Valle told the NPD officers Gerst lived on the second floor of an apartment building on the corner of Kimball and Chicago in Caldwell, Idaho.

---

FEMALE 4 my MONEY!!!"

(b) "I'm gonna rape this bitch n kill her kid over 25 bucks I swear I'm a fuckn sick nigga" — about an hour ago

(c) "I'll pay any girl …20 bucks to fight HildaValle" — 57 minutes ago

(Dkt. 43, ¶¶ 4-5; Dkt. 43-1.)

The last pertinent entry on the Facebook page was the photograph of the nude, bloody female. The textual entry reads, "Wild Mill Bill updated his cover photo 33 minutes ago." Thus, at the time the Facebook page was viewed by NPD on the evening of February 21, 2013, the threats had been posted about an hour before, and the picture had been posted approximately thirty minutes before. (*Id.*, ¶ 4.) The Court may consider this "new" evidence in its *de novo* review of the Report. *Akhtar v. Mesa*, 698 F.3d 1202, 1208 (9th Cir. 2012) ("[A] district court has discretion, but is not required, to consider evidence presented for the first time in a party's objection to a magistrate judge's recommendation.") (quoting *United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000)).

[3] As the Report concluded, a woman named Kristin Farris reported the Facebook posts to the NPD out of concern for Valle's safety. (Dkt. 41, p. 5, n. 4.)

After interviewing Valle, NPD Officer Becky Doney returned to NPD Dispatch and viewed Gerst's Facebook page. She observed the threatening comments and the picture of the naked, bloody female. Doney contacted the Caldwell Police Department ("CPD") and advised them about the picture and threatening comments. Shortly thereafter, the NPD sent the CPD Officers electronic copies of Gerst's Facebook page, including the threats and what Officer Davis described as "a photo of naked female covered in blood who appeared deceased or nearly deceased." (Dkt. 29-1, ¶ 5.) The CPD Officers viewed additional pictures on Gerst's Facebook page, including what Officer Bridges described as "photographs that depicted a male, who [the officers] later determined to be [Gerst]…, [and] Gerst with an assault rifle and a handgun, marijuana, and large sums of cash." (Dkts. 29-11, ¶ 5; 29-1, ¶ 10.)

The CPD Officers decided to proceed with a search of Gerst's apartment, and also decided not to knock and announce before doing so. The CPD Officers called for back-up and also called the on-duty deputy prosecuting attorney, who concurred in the decision to proceed with a no-knock, warrantless entry of Gerst's apartment. At approximately 12:44 a.m., the CPD Officers kicked in the door to the Johnsons' apartment. Upon encountering the Johnsons, the CPD Officers handcuffed two of the three family members, and detained all three in the hallway outside of their apartment. The CPD Officers conducted a brief search of the Johnsons' apartment and determined neither Gerst nor an injured female were inside.

Meanwhile, officers outside the building radioed the officers inside that a male in the apartment next door was "moving furtively." (Dkt. 29-1, ¶ 14.) Once the CPD

Officers established Gerst was not in the Johnsons' apartment, they concluded he must be in the apartment next door. Officer Hessman breached the door to the next door apartment, and the CPD Officers located Gerst inside. The search of Gerst's apartment found no sign of an injured female, but did uncover some marijuana, a bong, and other paraphernalia. Gerst was taken away and, at approximately 12:51 a.m., the CPD Officers removed the handcuffs and permitted the Johnson family to return to their apartment. Officer Davis then explained the situation to the Johnsons and the reason their apartment had been entered. The Johnsons thereafter filed suit, alleging four causes of action under 42 U.S.C. § 1983 and four causes of action Idaho law.[4]

## DISCUSSION

Defendants object to four aspects of the Report. First, Defendants suggest the Report utilized an incorrect legal standard to the emergency aid exception to the warrant requirement, and that the correct "totality of the circumstances" standard warrants summary judgment in favor of the CPD Officers because they objectively and reasonably believed that a female was in imminent danger in Gerst's apartment. Second, and

[4] Plaintiffs initially sued two NPD officers, the chief of the NPD, the NPD, and the city of Nampa ("Nampa Defendants"), as well as the CPD Officers, the CPD, the chief of the CPD, and city of Caldwell ("Caldwell Defendants"). All claims against the Nampa Defendants were voluntarily dismissed on February 10, 2015. (Dkt. 39.) In mid-December of 2014, the Caldwell Defendants filed the instant motion for summary judgment on all of the Johnsons' claims. The Report granted the Caldwell Defendants summary judgment with respect to each of the Johnsons' four state law claims. The Report also granted summary judgment with respect to the Johnsons' claims against the CPD, Chief Allgood and the City of Caldwell. Only the Johnsons' 42 U.S.C. § 1983 claims against the CPD Officers remain at issue.

independent of the objection to the legal standard applied in the Report, Defendants challenge the Report's qualified immunity analytical framework. Defendants argue there is no clearly established law that would have told the CPD Officers under the circumstances that the emergency aid exception may not apply, and, as such, contend the CPD Officers are protected by qualified immunity. Third, Defendants suggest the Report improperly parsed the circumstances the CPD Officers faced to determine the Johnsons' constitutional rights were violated by the CPD Officers' failure to knock and announce their presence. And fourth, Defendants object to the Report's analysis of the Johnsons' excessive force claim.

**I. Emergency Aid Exception**

The Johnsons contend that their constitutional rights were violated when the CPD Officers entered their home without a warrant in violation of the Fourth Amendment. "At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (internal quotation marks omitted) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)). Searches and seizures inside a home without a warrant are "presumptively unreasonable." *United States v. Martinez*, 406 F.3d 1160, 1163 (9th Cir. 2005) (internal quotation marks omitted) (quoting *Payton v. New York*, 445 U.S. 573, 585 (1980)). "The presumption, however, is not irrebuttable." *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009). "There are two general exceptions to the warrant requirement for home searches: exigency and emergency." *Id.* (quoting *Martinez*, 406 F.3d at 1163). These exceptions are "'narrow' and their boundaries are

'rigorously guarded' to prevent any expansion that would unduly interfere with the sanctity of the home." *Id.* (quoting *United States v. Stafford*, 416 F.3d 1068, 1073 (9th Cir. 2005)).

Under the exigency exception, police may enter a home without a warrant "if they have both probable cause to believe that a crime has been or is being committed and a reasonable belief that their entry is 'necessary to prevent…the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.'" *Id*. (quoting *United State v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984)). Under the emergency doctrine, police may enter a home without a warrant if they have "an objectively reasonable basis for concluding that there is an immediate need to protect others or themselves from serious harm."[5] *United States v. Snipe*, 515 F.3d 947, 951-52 (9th Cir. 2008).

Defendants argue the Report improperly applied the exigency standard by holding the CPD Officers were required to "demonstrate specific and articulable facts to justify the finding of 'emergency' to come within the emergency aid exception to the warrant requirement." (Dkt. 42-2, p. 8.) Defendants suggest police officers are required to demonstrate specific and articulable facts to justify warrantless entry in exigency cases,

[5] The primary distinction between the exigency and emergency doctrine is the emergency exception stems from the "community caretaking function," of police officers, which allows them "to protect or preserve life or avoid serious injury," while the exigency exception derives from police officers' investigatory function, and allows entry into a home without a warrant if there are both exigent circumstances and probable cause to believe that contraband or evidence of a crime will be found at the premises. *Mincey v. Arizona*, 437 U.S. 385, 392 (1978); *Hopkins*, 573 F.3d at 763.

but that specific and articulable facts need not be established in emergency cases. (*Id*.) Defendants contend the emergency aid exception instead requires only that the police have an objectively reasonable basis for believing that a person within a home is in need of immediate aid, and maintain the totality of the circumstances in this case demonstrate the objective reasonableness of the CPD officers. (*Id*., pp. 11-12) (citing *Michigan v. Fisher*, 558 U.S. 45, 47 (2009)).

The emergency and exigency doctrines are often confused. *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 553 (7th Cir. 2014) (stating there is some degree of overlap between the emergency and exigent circumstances exceptions, and the distinctions between them are not always clear); *Huff v. City of Burbank*, 632 F.3d 539 (9th Cir. 2011) (*overruled on other grounds in Ryburn v. Huff*, 132 S.Ct. 987 (2012) (counseling that the emergency doctrine, which requires an objectively reasonable basis, should not be conflated with the exigent circumstances doctrine, which requires both probable cause and a reasonable belief that entry is necessary). The Report based its finding that the CPD Officers were required to demonstrate "specific and articulable facts" to justify the finding of an emergency on *Sandoval v. Las Vegas Metro. Police Dept*., 756 F.3d 1154, 1161 (9th Cir. 2014). Defendants suggest the Report erred in relying upon *Sandoval* both because *Sandoval* post-dates the events in this case and because the "specific and articulable facts" test has only elsewhere been applied in exigency cases.

In *Sandoval*, the Ninth Circuit specifically stated the police "must demonstrate 'specific and articulable facts to justify the finding' *of either exigent circumstances or emergency*." *Id*. (emphasis added) (quoting *LaLonde v. Cnty. of Riverside*, 204 F.3d 947,

957 (9th Cir. 2000)). *Sandoval* was an exigency case. As Defendants note, *LaLonde* was also an exigency case, and, until the *Sandoval* court cited to *LaLonde*, no other court in the Ninth Circuit had cited it for the proposition that the "specific and articulable facts" test applies in the emergency aid context. (Dkt. 42-2, p. 12.) However, Defendants overlook *United States v. Dugger*, 603 F.2d 97 (9th Cir. 1979), a Ninth Circuit case applying the "specific and articulable facts" test to an emergency exception search as early as 1979.

In *Dugger*, the Ninth Circuit overruled the District Court's finding that a warrantless search was constitutional under both the emergency aid and exigency exceptions. *Id*. at 99. After interviewing the victim of a fight, police officers in *Dugger* followed a trail of blood leading from the victim back to the defendant's apartment, where they observed blood on the front door and keys in the lock. Officers rang the doorbell several times but heard no response from inside. Officers then turned the key, pushed the door open, identified themselves as police, and called to defendant. A male within the apartment responded that he was putting his shoes on and would be right there. *Id*. at 98. The officers entered and searched the apartment. The district court held the search was permissible under both the exigent and emergency exceptions to the warrant requirement. *Id*.

The Ninth Circuit reversed, holding the officers had no evidence that the defendant was armed or injured when they entered the apartment (and were thus without exigent circumstances to justify a warrantless search), and that defendant's statement that he would be right out dispelled any emergency which might otherwise have supported a

warrantless search under the emergency aid exception. *Id*. at 99-100. In so holding, the Ninth Circuit stated, "[r]ather than requiring the Government to point to *specific and articulable facts which, taken together with rational inferences from those facts, would reasonably warrant the warrantless intrusion*, the hearing transcript indicates that the District Court erroneously placed this burden on [defendant] to disprove any emergency." (emphasis added) (internal quotation marks and brackets omitted) (citing *Terry v. Ohio*, 392 U.S. 1, 21 (1968)). The Court further explained:

> Thus, even assuming…that the blood observed by the officers would, by itself, justify the officers' tracking the blood trail back to [defendant's] apartment, turning the key in the lock, pushing open the door, and then yelling out to [defendant], once the officers heard [defendant] respond from within that he coming outside as soon as he put on his shoes, any excuse of an emergency dissipated.

*Id*.

In light of *Dugger*, Defendants' objection to the Report's use of the "specific and articulable facts" standard is unavailing. The Ninth Circuit held the warrantless search in *Dugger* did not fall within the emergency exception because there were no specific and articulable facts to suggest the search was objectively reasonable. The Report did not err in applying the same test to the purported emergency situation presented in this case.

Moreover, even under the totality of the circumstances test Defendants advocate, the Court finds a reasonable jury could conclude Defendants lacked an objectively reasonable basis for believing there was an emergent situation inside Gerst's apartment. Specifically, after viewing Gerst's threats to victimize Valle on Facebook, the NPD met with Valle shortly before it requested the CPD's assistance. In light of the recent welfare check into Valle's safety, there was no objectively reasonable basis to believe Valle was

in imminent danger inside Gerst's apartment.[6] Like the situation in *Dugger*, once the officers ensured Valle—the specific target of Gerst's threats—was safe, the excuse of an emergency dissipated.[7]

Moreover, other than the photograph of the nude, bloody woman Gerst posted, there was no other evidence to suggest an unidentified female was in danger. In the absence of such evidence, the CPD Officers lacked an objectively reasonable basis to conduct a warrantless search. As the Report concluded:

> The picture is shocking, it depicts an act of horrific violence, and one might reasonably conclude the subject was in mortal danger. But it is wholly without context. Nothing, aside from its appearance on [Gerst's] Facebook page, would suggest that the act depicted occurred within the United States—let alone inside Gerst's apartment…. The picture is simply untethered—as a matter of time and

---

[6] Defendants' counsel conceded during oral argument that the CPD Officers knew Valle was not the nude, bloody woman in the picture Gerst posted to Facebook. (Dkt. 41, p. 26.)

[7] One of the threats on Gerst's Facebook page—"I'm gonna rape this bitch n kill her kid over 25 bucks"—does not specifically mention Valle. *Supra*, text accompanying note 2. However, Officer Davis, who viewed Gerst's Facebook page, indicated that the officers knew the threat was directed at Valle: "According to CPD Hessman, NPD Doney told him that… 'Wild Mill Bill' had threatened to kill a female named Hilda Valle and her child." (Dkt. 29-1, ¶ 5.) Further, as the Report highlighted:

> [Officer] Davis's understanding is consistent with the Facebook page viewed as a whole. The immediately preceding comment on Gerst's Facebook page—"if you know @hilda Valle Then Im Fuckin Smashn on yo Girl she took 25 bucks from me watch me BEAT A FEMALE 4 my MONEY!!!"—mentions both Valle and the $25 debt. It would be reasonable to infer that the rape threat was directed at Valle because it also mentions the $25 debt. Thus, to the extent the Caldwell Defendants argue the rape threat could be read as a threat against some unidentified female, that argument is inconsistent with both Davis's affidavit and the record viewed in the light most favorable to the Johnsons.

(Dkt. 41, p. 25, n. 8) (internal citations omitted).

> place—to the purported emergency occurring inside Gerst's apartment early on February 22, 2013. In an age when a few keystrokes can fetch gigabytes of disturbing imagery, it is a stretch at best to argue a picture on a website is, by itself, a sufficient predicate for a warrantless raid on a residence.[8]

(Dkt. 41, p. 26.)

While police officers "do not need ironclad proof of a likely serious, life threatening injury to invoke the emergency aid exception," the emergency aid doctrine does require "an objectively reasonable basis for believing that a person within [the house] is in need of immediate aid." *Michigan v. Fisher*, 558 U.S. 45, 49 (2009) (internal quotation marks and citations omitted). The Supreme Court applied this standard in *Brigham City v. Stuart*, 547 U.S. 398 (2006). There, police officers responded to a noise complaint in the early hours of the morning. As they approached the house, they could hear some kind of altercation occurring within. The officers saw juveniles drinking beer in the backyard and a fight unfolding in the kitchen. They watched through the window as a juvenile broke free from the adults restraining him and punched another adult in the face, who fled to the sink, spitting blood. *Id*. at 401. The other adults began pressing the juvenile "up against a refrigerator with such force that the refrigerator began moving across the floor." *Id*. Under these circumstances, the Supreme Court found it "plainly reasonable" for the officers to enter the house and quell the violence, because they had

[8] Although the record lacked the detail regarding the specific timing of Gerst's threats when the Report was issued, the fact such threats were made mere hours before the search in question does not alter the Court's finding with respect to the objective reasonableness of the search. Because the NPD had already determined Valle was safe, the purported emergency was largely eradicated before the CPD Officers were even contacted.

"an objectively reasonable basis for believing both that the injured adult might need help and that the violence in the kitchen was just beginning." *Id*.

Similarly, in *Michigan* , 558 U.S. at 45-46, police officers responded to a report of a disturbance. Like in *Brigham City*, when they arrived on the scene officers encountered a household "in considerable chaos: a pickup truck in the driveway with its front smashed, damaged fenceposts along the side of the property, and three broken house windows, the glass still on the ground outside." *Id*. The officers also noticed blood on the truck and on the doors of the house, and could see the defendant inside the house screaming and throwing things. *Id*. Officers knocked but defendant refused to answer. They saw a cut on his hand, and asked him whether he needed help. Defendant ignored police and demanded that they go get a search warrant. Police then entered the home. The Supreme Court held the emergency exception applied under such circumstances. In so holding, the Court found "it was reasonable to believe that [defendant] had hurt himself (albeit nonfatally) and needed treatment that in his rage he was unable to provide, or that [defendant] was about to hurt, or had already hurt, someone else." *Id*. at 49. Direct evidence supported officers' reasonable belief that entry was needed to avoid immediate harm in both *Brigham City* and *Fisher*.

Other emergency aid cases have also involved either direct or very strong circumstantial evidence of an emergency. For instance, in *United States v. Bradley*, 321 F.3d 1212 (9th Cir. 2003), the Ninth Circuit upheld a warrantless search under the emergency exception where police entered a home to locate a nine-year-old boy, Christopher, whose mother they had just arrested on drug charges. At the time of her

arrest, Christopher's mother told officers he was at home with a friend. Officers went to the home and knocked, but nobody answered. The police then contacted the officers transporting Christopher's mother and again asked her where her son was. This time she said he was across the street with a neighbor. The two officers went across the street and woke the neighbor, who told them that he did not have Christopher. The officers returned to the house and knocked again on the front door. When no one answered they went around to the back of the house and found an unlocked door. The officers then announced themselves and walked into the house.

The *Bradley* court upheld the warrantless search under the emergency exception, stating "[t]he possibility of a nine-year-old child in a house in the middle of the night without the supervision of any responsible adult is a situation requiring immediate police assistance." *Id*. at 1215. In so holding, the court explained that before the officers entered the house, they took several other steps to determine whether there was an emergency in the first place: they knocked on the front door, asked the mother again where Christopher was, went across the street to wake up a neighbor and ask him about Christopher, and again knocked on the front door before moving to the back of the house and entering without a warrant. *Id*. Because they could not locate Christopher despite having taken such steps, the officers had an objectively reasonable basis for believing a child inside the house was in need of immediate aid.

Similarly, in *United States v. Black*, 482 F.3d 1035 (9th Cir. 2007), police were dispatched to an apartment after Black's ex-girlfriend, Tyroshia Walker, called 911 and reported that Black had beaten her up that morning and that he had a gun inside his

apartment. Walker advised the 911-operator that she intended to return to the apartment with her mother in order to retrieve her belongings, and stated the two women would wait outside the apartment for the police to arrive before entering. When the police arrived at the scene a few moments later, there were no signs of Walker, her car, or her mother. The two officers knocked on the apartment door but received no response. They then contacted the apartment manager in an attempt to gain entry into the building. In the meantime, one of the officers circled the building to inspect the backyard and encountered an individual who matched Black's physical description. The individual identified himself as Jasper Black and admitted he knew the police were investigating a domestic violence call. He denied knowing the whereabouts of Walker and also denied that he lived in the apartment. With his consent, police searched Black for weapons and located a key to the apartment in his pocket. Police then used the key to enter and search the apartment for Walker.

The Ninth Circuit held the police were justified in their entry under the emergency exception because they had an objectively reasonable belief that Walker could have been inside the apartment, badly injured and in need of medical attention. The *Black* court explained:

> Walker could have returned to the apartment after her 911 call, but before police arrived at the scene. At that point, Black could have managed to pull her back into the apartment. Once inside the apartment, Black—in a repeat performance of his behavior earlier that morning—could have beaten Walker again and left her in the apartment severely injured. Even worse, he could have shot Walker using the gun that police knew was inside the apartment…. The combination of these circumstances support an objectively reasonable belief that Walker could be in the apartment.

*Id*. at 1039-40.

The aforementioned cases contrast sharply with the circumstances in this case. As opposed to a violent conflict or a screaming suspect, the CPD Officers were confronted with a quiet scene when they approached the Johnsons' apartment on February 22, 2013. There was no blood, yelling, sign of a struggle, or any other evidence to suggest an impending injury requiring police intervention. Nor, as in *Bradley* or *Black*, did the officers have any reason to suspect a specific individual was in danger. Valle, the only individual Gerst had threatened, had already been found alive and well.

Defendants argue the Report's reliance upon the nature of the scene outside the Johnsons' apartment has no bearing on the objective reasonableness of the CPD Officers, citing *United States v. Snipe*, 515 F.3d 947 (9th Cir. 2008), *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 553 (7th Cir. 2014), and *Martin v. City of Oceanside,* 360 F.3d 1078 (9th Cir. 2004). (Dkt. 42-2, p. 19.) Defendants ignore that the court in *Snipe* held the facts the officers confronted when they arrived at the Snipe residence underscored the entry's reasonableness. Snipe, 515 F.3d at 954. Specifically, in response to an emergency 911-call, the police officer who arrived at the scene, who was also Snipe's neighbor, immediately noticed a vehicle he did not recognize, an individual he could not identify entering the Snipe residence, and that the "residence itself looks suspicious because the front door was ajar and he could see light coming from inside the house." *Id*. Like *Brigham City* and *Fisher*, *Snipe* illustrates that the scene of a potential emergency is relevant to the objective reasonableness inquiry. *See also United States v. Martinez*, 406 F.3d 1160, 1165 (9th Cir. 2005) (finding emergency exception appropriate where police

officers responding to report of domestic violence encountered woman crying on front lawn of home and heard a man shouting from inside).

In *Sutterfield* and *Martin*, the Ninth Circuit determined the emergency aid exception applied to a warrantless search although law enforcement officers were not confronted with screaming, fighting or chaos when they arrived at a home. Instead, like in *Bradley* and *Black*, officers in *Sutterfield* and *Martin* were attempting to locate a specific individual who had been reported missing or in danger by either their health care provider or loved one. Here, by contrast, the CPD Officers knew Valle was safe and had no reason—other than a disturbing image posted on the internet—to believe an unidentified woman was in danger.

Although the picture of the unidentified woman gave the CPD Officers reason to be concerned, it was not alone enough to establish an emergency requiring immediate access to Gerst's apartment. The Ninth Circuit has made clear, "if police officers otherwise lack reasonable grounds to believe there is an emergency, they must take additional steps to determine whether there is an emergency that justifies entry in the first place." *Hopkins*, 573 F.3d at 765 (citing *United States v. Russell*, 436 F.3d 1086, 1092 (9th Cir. 2006)); *see also Bradley*, 321 F.3d at 1215. The CPD Officers did not take any additional steps in this case to determine whether there actually was an emergency before they kicked down the Johnsons' door.

Defendants argue the CPD Officers did have other reliable indicators that a female was at risk. (Dkt. 42-2, p. 16.) The record does not support this contention. First, Defendants claim the CPD Officers knew that some citizen was concerned enough to

notify law enforcement. *Id*. However, as Plaintiffs note, there is nothing in the record to indicate that a concerned citizen was worried about the safety of the woman pictured in Gerst's final Facebook post on the night of February 21, 2013. Instead, the concerned citizen—Kristin Farris—reported a specific threat Gerst posed to Valle, not to a "phantom woman." (Dkt. 46, p. 2; Dkt. 41, p. 5.) Second, Defendants claim the NPD was concerned enough after viewing the Facebook pages to contact the CPD Officers. Defendants omit that the NPD Officers had also already located Valle and were not concerned with her safety. Third, Defendants note that when NPD contacted the CPD Officers, NPD told them that there was a possible kidnapping and torture taking place. As the CPD Officers knew, however, this purported crime was based solely on the disturbing photograph Gerst posted to his Facebook page. There had been no reports of a missing woman or violence to suggest such crime was actually occurring. Fourth, the posts on Gerst's Facebook page demonstrated his depravity in offering to pay someone to beat up Valle and his threats to murder and rape innocent victims. While true, there was no other evidence to suggest Gerst's threats, although extremely upsetting and depraved, were anything but talk. In fact, the only evidence the CPD Officers had at the time they decided to search Gerst's apartment without a warrant supported the latter conclusion, as the target of Gerst's threats had already been found unharmed. Finally, like the police in *Black*, Defendants also emphasize the CPD Officers knew the suspect in this case possessed a gun (and therefore had means to murder his victim) due to the pictures of Gerst holding a gun on his Facebook page. That Gerst, at an unknown time and place, at one time held a gun for a picture does not mean that he possessed a gun in his residence

on the night in question. Nor is it on par with the officers' knowledge that the suspect in *Black* had weapon, as the victim in *Black* had told officers only a few minutes before the search in question both that the suspect had a gun and that the gun was in his apartment.[9]

When considering exigency cases, the Court is mindful that Supreme Court precedent has "consistently eschewed bright-line rules" and instead focused on the fact specific nature of the reasonableness inquiry by looking at the totality of the circumstances. *United States v. Reyes-Bosque*, 596 F.3d 1017, 1029 (9th Cir. 2010) (citations omitted). The Court also appreciates that because police officers "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving," the reasonableness inquiry must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Graham v. Connor*, 490 U.S. 386, 397 (1989) (citing *Terry v. Ohio*, 392 U.S.1, 20-22 (1969)). However, given the totality of the circumstances in this case, the Court cannot conclude the picture on Gerst's Facebook page—without any other evidence to suggest an emergency requiring immediate assistance—provided the CPD Officers with an objectively reasonable basis to suspect someone was imminent danger inside Gerst's apartment.[10]

---

[9] In addition, the mere fact that a person owns a gun "does not in itself allow police officers to enter the person's home and seize him…even if probable cause exists to believe that some offense has been committed." *LaLonde*, 204 F.3d at 957 n. 16.

[10] Defendants also fault the Report for concluding the time the CPD Officers took to investigate the underlying circumstances (approximately one hour and twenty minutes after receiving the NPD's call for assistance) undercut their claim of an emergency (Continued)

**II. Qualified Immunity**

Defendants next contend the Report erred in concluding the CPD Officers did not have qualified immunity for the entry into the Johnsons' apartment under the emergency aid doctrine. (Dkt. 42-2, p. 12.) The doctrine of qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Green v. City of San Francisco*, 751 F.3d 1039, 1051 (9th Cir. 2014) (quotation marks omitted) (citing *Stanton v. Sims*, 571 U.S. ---, 134 S.Ct. 3, 4-5

---

justifying a warrantless search. (Dkt. 42-2, pp. 19-21.) Defendants cite three cases "where there were significant time lapses between a reported emergency and the police officer response and the Courts held the emergency aid and or exigency exceptions applied." (Dkt. 42-2, p. 20.) Such cases are distinguishable. In *United States v. Reyes-Bosque*, 596 F.3d 1017, 1030 (9th Cir. 2010) officers waited for only fifteen to twenty minutes for backup before entering. Because the exigent circumstances still existed at the time of the entry, the court found the short wait did not negate the officer's reliance on the emergency exception. By contrast, here the CPD Officers "had enough time to gather backup, scrutinize Gerst's Facebook page, review Gerst's criminal record, link Gerst's vehicle to 409 North Kimball, and deliberate how to proceed. In other words, the officers determined there was an emergency requiring immediate police action more than an hour after receiving the call from the NPD." (Dkt. 41, pp. 26-27.) In the other two cases Defendants cite, *United States v. Williams*, 2015 WL 429087 (W.D.N.Y. 2015) and *Sutterfield v. City of Milwaukee*, 751 F.3d at 562, hours passed between a report to the police and the warrantless entry into a home. Although the searches in both cases were found to satisfy the emergency exception, both cases involved specific endangered individuals who could not be found for several hours. Moreover, even where a specific individual was reported missing, the *Sutterfield* Court expressed concern about the lapse of time, and reiterated that the emergency aid doctrine presumes "that there is an emergency that requires expeditious, if not immediate, action on the part of police." *Id*. In this case, the CPD Officers did not have evidence of a threat to any specific individual, and their actions in waiting eighty minutes to enter Gerst's apartment suggests that they did not believe immediate action was necessary.

(2013)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments," and "protects 'all but the plainly incompetent or those who knowingly violate the law.' " *Ashcroft v. al-Kidd*, 563 U.S. ---, 131 S.Ct. 2074, 2085 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

There are two prongs to the qualified immunity analysis: (1) whether the officers' conduct, viewed in the light most favorable to the party asserting injury, violated a constitutional right, and (2) whether the right was "clearly established" such that a reasonable officer would have known his conduct violated the right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first[.]" *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As the preceding section illustrates, the Court agrees with the Report's finding that the CPD Officers' conduct, viewed in the light most favorable to the Johnsons, violated the Johnsons' Fourth Amendment right to be free from warrantless intrusion into their home. Thus, the Court here addresses only the Report's finding with respect to the second prong of the qualified immunity inquiry.

The Report concluded the "clearly established law at the time of the raid required a reasonable belief of imminent danger—supported by specific, articulable facts—to invoke the emergency aid exception." (Dkt. 41, p. 28.) Defendants object to the "specific and articulable facts" test but, as explained above, such objection is inapposite. Further, it is undisputed that clearly established law requires that police have an objectively reasonable basis for believing that a person within a house is in need of

immediate aid in order to invoke the emergency exception to the warrant requirement. *Fisher*, 558 U.S. at 47. As discussed above, even under the totality of the circumstances, a reasonable jury could conclude the CPD Officers lacked an objectively reasonable basis for entering the Johnsons' home.

In addition to objecting to the specific and articulable facts test, Defendants claim:

> Neither the Report, nor the Johnsons, located a single case that would have put the Caldwell Police Officers on notice that the emergency aid exception did not apply under the circumstances that confronted them. The Report faults the Caldwell Police Officers for their concerns emanating from a photograph on a Facebook page, but no cases are cited that would put the Caldwell police Officers on notice that they could not do so…. In short, the law was not clearly established that the Caldwell Police Officers could not objectively, reasonably believe that there was a female at risk in Gerst's apartment.

(Dkt. 42-2, p. 14.)

Defendants misstate the test for determining whether a law is clearly established. There need not be a "case directly on point" in order for law to be clearly established. *Al-Kidd*, 131 S.Ct. at 2074. It is also "not necessary that the alleged acts have been previously held unconstitutional, as long as the unlawfulness [of defendant's actions] was apparent in light of pre-existing law." *San Jose Charter of Hells Angels Motorcycle Club v. City of San Jose*, 402 F.3d 962, 977 (9th Cir. 2005) (alterations in original) (internal quotation marks omitted). Further, officials "can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Courts must be "particularly mindful of this principal in the context of Fourth Amendment cases, where the constitutional standard—reasonableness—is always a very fact specific inquiry." *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1091 (9th Cir.

2013). The Report carefully analyzed the circumstances of this case and determined such facts did not support an objectively reasonable basis for believing there was an emergent situation inside Gerst's apartment. (Dkt. 41, pp. 21-28.) The Court agrees with this finding.

Defendants also fault the Report for distinguishing *Brigham City* and *Fisher* from the facts of this case, rather than surveying the "case law to determine whether an objectively reasonable officer would know what he is doing violates the Constitution." (Dkt. 42-2, p. 13.) *Brigham City* and *Fisher* are the two most recent and comprehensive Supreme Court cases to define the contours of the emergency aid exception. The Report did not error in distinguishing this case from such precedent for purposes of the qualified immunity analysis. Moreover, the Report did survey Ninth Circuit cases applying the emergency aid exception to determine the CPD Officers lacked objectively reasonable basis to conduct a warrantless search under the circumstances in this case. (Dkt. 41, pp. 27-28) (explaining Ninth Circuit cases applying the emergency exception all involved officers confronted with either direct or very strong circumstantial evidence of an emergency, unlike the scant evidence of such in this case) (citing *United States v. Bradley*, 321 F.3d 1212 (9th Cir. 2003); *Martin v. City of Oceanside*, 360 F.3d 1078 (9th Cir. 2004); *United States v. Martinez*, 406 F.3d 1160 (9th Cir. 2005); *United States v. Russell*, 436 F.3d 1086 (9th Cir. 2006)). The Court agrees with and adopts the Report's finding that the CPD Officers were not entitled to qualified immunity on the Johnsons' unlawful entry claim.

## III. Unannounced Entry

Defendants also object to the Report's conclusion that a reasonable jury could find the CPD Officers lacked an objectively reasonable basis for disregarding the knock-and-announce rule. "That the government must announce its presence before entering a private home is a longstanding principle." *United States v. Combs*, 349 F.3d 739, 743 (9th Cir. 2004.) In *Wilson v. Arkansas*, 514 U.S. 927, 931-33 (1995), the Supreme Court traced the origins of the knock-and-announce rule to English common law. The *Wilson* Court held that "the method of an officer's entry into a dwelling [is] among the factors to be considered in assessing the reasonableness of a search or seizure." *Id*. at 934.

*Wilson* and cases following it have noted there are many situations where it is not necessary to knock and announce, such as when circumstances present a threat of physical violence, if knocking and announcing would be futile, or if there is reason to believe that evidence would likely be destroyed if advance notice were given. *Hudson v. Michigan*, 547 U.S. 586, 589-90 (2006) (collecting cases). "[P]olice need only have a reasonable suspicion…under the particular circumstances that one of these grounds for failing to knock and announce exists," and the Supreme Court has acknowledged that "this showing is not high." *Id*. at 590 (internal quotation marks omitted) (citing *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).

Defendants contend the same facts that support the existence of an emergency also supported the CPD Officers' decision not to knock and announce their presence. (Dkt. 42-2, p. 22.) Specifically, Defendants suggest the evidence known to the CPD Officers justified an objectively reasonable officer to conclude that there was danger to the victim

and others if they first knocked and announced before entering the apartment. (*Id*.) As discussed above, under the facts viewed in the light most favorable to the Johnsons, it was not objectively reasonable to believe anyone was in danger inside Gerst's apartment. Because the knock and announce rule and its potential exceptions were also clearly established on the night of the raid, the Court adopts the Report's denial of qualified immunity on the Johnsons' knock-and-announce claim. (Dkt. 41, pp. 28-32.)

**IV. Excessive Force**

Finally, Defendants object to the Report's analysis of the Johnsons' excessive force claim. The Report determined that because "the officers' warrantless entry into the Johnsons' apartment was unlawful under the Fourth Amendment, their suspicionless detention of the family was also unlawful." (Dkt. 41, p. 36) (citing *Payton v. New York*, 445 U.S. 573, 589-90 (1980)). Defendants contend since the Report "errs on the constitutionality of the entry into the apartment, its recommendation with respect to Johnsons' detention and [CPD Officers'] use of force is also in error." (Dkt. 42-2, p. 23.) The Court has addressed and rejected Defendants' objections with respect to the constitutionality of the entry into the apartment, and will not repeat such analysis here.

**ORDER**

**NOW THEREFORE IT IS HEREBY ORDERED** that the Report and Recommendation entered on April 8, 2015 is **ADOPTED** in its entirety.

**IT IS THEREFORE ORDERED** Defendants' Motion for Summary Judgment (Dkt. 29) is **GRANTED IN PART AND DENIED IN PART**.

DATED: September 10, 2015

Edward J. Lodge
United States District Judge